SANFORD S. ZACK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zack v. Commissioner
Docket No. 10560-75.
United States Tax Court
T.C. Memo 1981-700; 1981 Tax Ct. Memo LEXIS 45; 43 T.C.M. (CCH) 50; T.C.M. (RIA) 81700; December 9, 1981. David J. Lieberman and John H. Shepherd, for the petitioner. Peter M. Ritteman, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to the tax in this case as follows: Deficiencies in
Additions to the
Taxable Year
Income Tax
Tax (Sec. 6653(b)) [1]
1959
$ 51,937.98
$ 25,968.99
1960
58,601.48
29,300.74
1961
50,279.94
25,139.97
1962
81,569.79
40,784.89
1963
115,604.99
57,802.49
1964
175,110.68
88,245.84
1965
83,983.34
41,991.67
Totals
$ 617,088.20
$ 309,234.59
*47 After concessions, [2] the issues for decision are as follows: 1. Whether respondent correctly determined deficiencies in petitioner's income taxes for the years 1959 through 1965; 2. Whether any part of petitioner's underpayment of tax for each of the years involved was due to fraud with intent to evade tax within the meaning of section 6653(b); and 3. Whether assessment and collection of the deficiencies for the years 1959 through 1965 are barred by the statute of limitations in section 6501(a). FINDINGS OF FACT Some of the facts have *48 been stipulated by the parties. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Sanford S. Zack (hereinafter petitioner) was a legal resident of Southfield, Michigan, at the time the petition in this case was filed. Petitioner filed Federal individual income tax returns for the years 1959 through 1965, inclusive, with the District Director of Internal Revenue for the District of Detroit, Michigan. Petitioner, a single man, lived with and supported his mother, Minnie Zack, during the years in question, and computed his income taxes due for those years using the "head of householdc rates. All of the returns were timely filed except the return for 1964, which was filed late. After working as a canvasser for a home modernization company since 1951, petitioner went into the home improvement contracting business for himself in 1953. From 1955 through 1965, petitioner operated in the Detroit, Michigan area principally under the names Insured Home Improvement Company (hereinafter Insured) and Manufacturers Construction Company (hereinafter Manufacturers). Petitioner used both names interchangeably to refer to his *49 business activities and conducted business from two offices during the years in question, one at his home and one on Livernois Street. Petitioner's companies were primarily engaged in the sale of home improvement and home repair jobs to individual homeowners in the poor inner city area of Detroit, Michigan. Most of petitioner's customers were between the ages of 60 and 80, were moderate and low income working people, were already in debt, and had little education. In connection with these companies, petitioner employed three to four salesmen, subcontractors, and, beginning in February of 1964, a secretary named Flora Hall. Petitioner's salesmen canvassed the neighborhoods soliciting customers and sold 80 to 85 percent of the companies' home improvement jobs. The remaining 15 percent of the companies' jobs were sold either by petitioner himself or through referrals from past customers. Petitioner did not pay his salesmen a specified salary. Instead, once a job was sold and the work completed, petitioner paid the salesman involved 50 percent of the gross profit on the job as a sales commission and kept the other 50 percent of the gross profit himself. Petitioner paid most commissions *50 to his salesmen in cash. Petitioner hired subcontractors to perform all of the actual work on all jobs sold by his companies. Subcontractors were also paid in cash for their services either by petitioner, petitioner's mother, or a salesman. To the extent that petitioner's salesmen or his mother paid a subcontractor with their own funds, petitioner reimbursed them. Petitioner's mother worked for him and she made cash advances out of petitioner's funds for various business expenses. She made such cash advances on his behalf totalling $ 8,085.09 during 1962 and $ 6,804 during 1963. In order to keep track of cash outlays on those few occasions when petitioner paid both a sales commission and a subcontractor's fee to the same person, petitioner made separate payments for each service. Beginning in February of 1964, petitioner also employed Flora Hall as a secretary for Manufacturers to type, answer phones, and take messages. Hall worked at petitioner's Livernois office until a small fire occurred there in June or July of 1964, at which time she began working out of petitioner's home office. Since petitioner's customers could not pay for jobs directly and often had pre-existing *51 debts when jobs were sold to them, they had to borrow money to pay for the home improvements. The majority of petitioner's home improvement sales was financed through loans secured by the homeowners under the Federal Housing Administration (FHA) Title I Property Improvement Loan Program. In the typical home improvement transaction, petitioner had the customer sign a contract on the job, copies of which went to the bank handling the loan and to the customer. Petitioner never retained any copy of the contract but instead jotted a few notes about the contract on the back of a blank contract form or other piece of paper in his job file. Petitioner and the customer then filled out and signed an FHA Form 1080, Credit Application for Property Improvement Loan. Since his customers often had pre-existing debts, petitioner sometimes induced them to purchase jobs by offering to increase the job price to be listed on the FHA credit application by the amount of debts the customer already owned. Then, after the bank gave its oral approval but before it issued its written approval notice regarding the credit application, petitioner made any cash advances with his own funds so that the customer *52 could pay off his bills. Upon completion of the work, petitioner received from the bank a check for the full amount of the home improvements listed as made, which included the amount of any cash advance already made to the customer. The customer then made payments to the bank on the FHA home improvement loan, which covered both the cost of the job and any advance for the homeowner's pre-existing debts. Petitioner's cash advance system is commonly known in the home improvement industry as debt consolidation or rebates. Petitioner testified that debt consolidation was practiced by other contractors in the home improvement business in the Detroit area at that time, and, petitioners' salesman Bernard Moss stated that debt consolidation was practiced by petitioner in 75 to 80 percent of his jobs. 2a
Sometime after the bank orally approved a customer's credit application and petitioner made any cash advance, petitioner had his subcontractors perform the actual work on the job. Once the job was completed, petitioner and the customer were required to fill out *53 and sign an FHA Completion Certificate for Property Improvement Loan. Before the bank would pay petitioner for the job, petitioner had to present to the bank the job contract, a credit application, and a completion certificate, each signed by the customer and by petitioner, as well as a promissory note signed by the customer (borrower). Usually within 30 to 45 days of receiving those four documents, the bank paid petitioner either by depositing the proceeds to his checking accounts or by issuing him a cashier's check. [3] The customer involved made his payments directly to the bank, and petitioner did not receive any payments directly from the customer unless petitioner performed extra work not covered by the customer's FHA loan. Both the FHA credit application and the completion certificate that petitioner and the customer were required to sign contained a clause stating that the seller (petitioner herein) thereby verified that no *54 cash payment, rebate, or offer of debt consolidation had been made to the borrower as an inducement to the transaction. Submission of a false credit application or a false completion certificate is a felony under the United States Criminal Code, Title 18, U.S.C., section 1010, and subjects the violator to up to two years in prison or a $ 5,000 fine, or both, for each violation. [4]
*55 In 1958, 1960, and 1963, petitioner and some of his customers were investigated by the Federal Bureau of Investigation (FBI) because of allegations that petitioner was making payments to customers of a portion of FHA home improvement loan proceeds. Beginning in November of 1964, respondent's agents examined petitioner's Federal income tax returns, and beginning about June of 1965, a criminal investigation was commenced. On April 15, 1969, petitioner was indicted on two counts of evasion of Federal income taxes under section 7201 for the taxable years 1962 and 1963, and for filing false and fraudulent income tax returns under section 7206(1) for the taxable years 1962 and 1963. On November 11, 1971, petitioner entered a plea of nolocontendere to evasion of taxes under section 7201 for the year 1963. The remaining three counts of the indictment were dismissed. Throughout the investigations and criminal tax proceedings and up until August 25, 1972, petitioner denied making any payments of FHA loan proceeds to home improvement customers. He made such denials in statements he made to the FBI, to respondent, and to the Manufacturers Bank, Detroit, Michigan. He made those *56 false statements to the Federal officials in the course of their official duties. Since August 25, 1972, however, petitioner and his various authorized representatives have claimed that petitioner made cash payments to customers of a portion of the FHA home improvement loan proceeds. At the trial herein, petitioner testified that when he signed the statements in the FHA documents and in the bank loans certifying that all proceeds were used in the home improvement business, he knew that he was making false statements and that such false statements were in violation of Federal law, but that he did so to avoid prosecution for FHA fraud. Petitioner testified that his desire to avoid prosecution for FHA violations not only caused him to deny making payments to customers before the seven-year statute of limitations on the FHA violations ran in 1972, but also to (1) make all of such payments in cash; (2) instruct his customers in 1967 to deny receiving payments when questioned by respondent; and (3) enter the nolocontendere plea to tax evasion for 1963 so that he would not have to defend that charge with evidence of his illegal rebates or cash advances on the FHA home improvement *57 loans. Throughout the years in question, petitioner failed to maintain the normal books and records for a home improvement and home repair contracting business. Petitioner himself prepared most of his business records such as they were. The bulk of his original business records was comprised of "job estimate work sheets," which were notes he jotted down on the back of blank FHA contract forms or other pieces of paper. These notes allegedly showed the total amount of the FHA loan, the amount of the job, the cash rebate or advances to the customer, subcontractor's payment, and salesman's commission. However, this information had to be interpreted by petitioner himself and was not self-explanatory. Petitioner maintained two checking accounts during the period pertinent to this case, a checking account for Insured at the National Bank of Detroit from 1959 to 1965 and a checking account for Manufacturers at Manufacturers National Bank from 1963 to 1965. Since petitioner dealt with customers, subcontractors, and salesmen largely in cash, he made most of his checks payable to cash and wrote few checks to named payees. Although petitioner usually cashed such checks himself and *58 made payments in cash, he also gave such checks to other persons so that they could endorse and cash them. During 1964, petitioner issued checks payable to cash that were endorsed by customers, salesmen, and other employees in the total amount of $ 9,073.75. At the trial, however, petitioner presented no checkbooks or monthly bank statements, no cash daybooks, no cancelled checks to cash for 1959 and 1960, and only a few cancelled checks to cash for 1961 through 1965. Neither petitioner nor his customers had any receipts or other contemporaneous records showing any cash advances. Petitioner's tax returns for the years 1959 through 1964 were prepared by a self-employed accountant, Raymond Parker. As indicated above, for the years 1959 through 1961, petitioner made written notes in regard to each job contract and filed them in individual folders that he kept for each job. These folders were unnumbered and contained some invoices and work sheets that listed the amount of the bank loan, gross receipts, subcontractor and commission costs, other expenses, profit, and cash advances or rebates on each job contract. Petitioner gave Parker written summaries of these folders as well *59 as additional information orally from which Parker made adding machine tapes and prepared petitioner's tax returns. For the tax year 1962, Parker prepared a job book summarizing some of the figures shown on the job estimate work sheets. That job book (for the year 1962) was prepared about June of 1963, after the 1962 tax return had been prepared and filed. The 1962 job cost book showed the same figures for gross receipts, split profits, and subcontracts that were shown on Schedule C of petitioner's 1962 tax return from which it was copied. Parker set up the system for a job book and expected petitioner to maintain such a book for the next tax return, but that was not done. As for the 1963 return, Parker and petitioner's sister worked together to prepare a columnar sheet containing information that was apparently again taken from summaries or information furnished by petitioner. Based on petitioner's own estimates and no written records, Parker also prepared financial statements of Insured as of February 29, 1961 and December 31, 1962; and petitioner filled out a Statement of Condition of Insured as of February 28, 1960. These documents were submitted by petitioner to the *60 National Bank of Detroit and read as follows: Date
Accounts Receivable
Net Worth
Increase in Net Worth
2/28/60
$ 18,650
$ 75,564
2/29/61
21,200
82,662
$ 7,098
12/31/62
24,600
99,100
16,438
In 1964 and 1965, neither petitioner nor Parker made up any job books. Although Parker had several times suggested to petitioner that he needed to set up some type of accounting system for his home improvement business, petitioner never set up any system at any time during the years involved in this case. [5] Other than preparing petitioner's tax returns each year, Parker did some other work for petitioner perhaps three or four times each year. The record does not establish the nature of any such work, but it is clear that Parker never maintained any accounting or other business records for petitioner. Parker prepared petitioner's tax returns based upon the limited information, written and oral, furnished by petitioner as indicated above. In 1964, petitioner gave Parker oral and written information on his jobs, together with adding machine tapes, from which Parker prepared the return. Parker did not check the adding machine tapes and did not know who prepared *61 them. Sometime after the tax investigation commenced, petitioner and Parker gave Flora Hall petitioner's job estimate work sheets, assorted checks, and some prepared lists; and they instructed her to separate, file in job folders, and prepare summaries of the figures in those documents. Beginning in the early part of 1965, Flora Hall did some work at the direction of petitioner's accountant, Raymond Parker. At Parker's direction, she separated various checks, ran adding machine tapes, and performed other tasks. She had no training as a bookkeeper or accountant, was not familiar with petitioner's records, and had little or no understanding of either the nature or the purpose of the work she did for Parker. This work with Mr. Parker lasted about four or five days, and Flora Hall never saw those documents again after that time in early 1965. In 1965, petitioner *62 hired a full-time bookkeeper, Ruth Kailif, to replace Parker. However, petitioner did not institute any type of record keeping system after he hired the bookkeeper, and his records for 1965 were substantially the same as for the earlier years. On January 27, 1965, Parker showed Revenue Agent Ronald Francisco whatever he had of petitioner's records for 1962 and 1963, including the 1962 job book, the columnar sheet for 1963, cancelled checks, subcontractor cost schedules, a 1962 split profit list, and some adding machine tapes. Shortly thereafter, one of respondent's agents issued a summons to Parker for those documents in connection with the criminal tax investigation. When he received the summons, Parker told Francisco that the records were in the possession of petitioner's attorney, Neal Zales. However, at the trial petitioner testified that Parker in fact had the records when he received the summons and lied when he told the agents that he had already given the records back to petitioner two days earlier. [6]
The record is not clear as to whether or not Parker *63 still had the records when he received the summons. However, the record clearly establishes that petitioner passed his records from one person to another in order to keep respondent's agents from obtaining them. The records were passed (1) from Parker to petitioner and/or his then attorney, Neal Zales, (2) from Zales to another attorney, Mr. Greenblatt, (3) from Greenblatt to attorney Fred Walker, who represented petitioner in the criminal case, and (4) from Walker to David Lieberman, who represented petitioner in the Tax Court proceeding.The various attorneys also had several accountants work with the papers at different times in connection with the criminal case and the civil tax case. David Lieberman was associated with the J.K. Lasser Company at that time, which company was employed by petitioner to prepare a protest letter in the civil tax investigation. Between April and August of 1972, Edgar Goldman, an accountant with J. K. Lasser, prepared a protest letter to the proposed adjustments in the report of Revenue Agent Michael Cinnamon. The protest letter was dated August 25, 1972. To enable Goldman to prepare the protest, petitioner in the middle of 1972 gave him the following *64 records: a limited number of job estimate work sheets for 1960, job estimate work sheets for each of the years 1961 through 1965, a few cancelled checks for 1960, a large number of cancelled checks for 1961, substantially all the cancelled checks for 1962 through 1964, check stubs for 1961 through 1964, monthly bank statements for 1961 through 1964, a cash daybook for 1961 through 1964, and tax returns for 1961 through 1965. [7] There were no records for 1959 and only a few items for 1960. Petitioner had to explain his record system to Goldman so that Goldman could interpret the job estimate work sheets and prepare summaries. *65 Using petitioner's job estimate work sheets and petitioner's explanation as to what they meant, Goldman made summaries for 1962 and 1963 showing the customer's name and address, the contract price, loan proceeds, and the cash advance or portion of loan proceeds allegedly remitted to customers for each job. In preparing the summaries for 1962 and 1963, Goldman made no analysis of material and subcontractor costs incurred by petitioner. Based on these same records for 1961 through 1965, Goldman at some point made additional summaries for the other years, showing the total bank loan, the proceeds to Insured, and the cash advances or rebates of loan proceeds to customers on each job. Petitioner submitted these summaries to respondent's agents for the first time sometime after June of 1973 and again at the trial in this case. Since these latter summaries were in Goldman's handwriting, petitioner had Flora Hall type them. In so doing, Hall corrected what she believed to be errors of interpretation of sales prices or amounts of rebates or advances listed by Goldman, and Goldman approved her changes. These summaries prepared by Goldman in 1972 and 1973 represented the first attempt *66 by petitioner or by any of his representatives to determine the amounts of cash advances or rebates allegedly made to petitioner's home improvement customers for the years involved in this case. Even then, no summaries of home modernization sales or claimed payments to customers were submitted for the years 1959 and 1960. The summaries submitted to respondent showed the following claimed payments to customers of cash advances or portions of FHA home improvement loans: 1961
$ 83,530
1962
90,713
1963
101,715
1964
53,218
1965
62,890
Beginning in December of 1963, petitioner had expanded the business activities of Insured and Manufacturers to include a fire repair operation. In the fire repair business, petitioner was engaged in the sale of home repair jobs to homeowners who had suffered loss or damage from house fires. Petitioner signed three to five fire repair contracts in December of 1963 and started work on those jobs in January or February of 1964. Petitioner ran this business from his Livernois office until a small fire occurred there in June or July of 1964, after which he moved the operation to his home. There was a wooden file cabinet containing *67 stacks of manila file folders at the Livernois office, but the record does not establish whether those files related to the home modernization business or to the fire repair business, or whether any of those files were lost as a result of the fire in that office. See footnote 7. Although petitioner originally registered his Livernois fire repair operation under the name Varsity Construction Company, he never did business under that name and performed most of his fire repair work under the name of Manufacturers. There is no evidence, however, as to the percentage of Manufacturers' business in 1964 and 1965 which was attributable to fire repair versus home modernization jobs. In his fire repair business, petitioner employed the same salesmen, subcontractors, and secretary as in his other business. Petitioner obtained fire repair jobs through insurance companies, referrals by neighbors or other individuals, and salesmen who solicited jobs on his behalf. Petitioner paid neighbors or other individuals a so-called "bird dog fee" for referring jobs to him and paid his salesmen a variable commission of 10 to 50 percent of gross profits on the jobs they sold. Petitioner also hired *68 and paid subcontractors to perform the actual repair work on the fire jobs as he did in the home improvement business. Petitioner's secretary, Flora Hall, wrote down fire repair jobs received over the phone and set up files on fire repair jobs. Since many of petitioner's checks were bouncing during that period of 1964 and 1965, he frequently paid his salesmen, subcontractors, and bird dog fees on fire repair jobs in cash. Since many of petitioner's fire repair customers were unable to remain in their homes after the fire and needed money immediately, petitioner and his salesmen made advances to them in cash or by check so that they could stay in motels and purchase food and clothing. Unlike petitioner's cash advances or rebates to his home improvement customers, neither his advances to fire repair customers nor the fact that he made some of such advances in cash was illegal. To the extent that salesmen made advances to fire repair customers, petitioner reimbursed the salesmen. Once a fire repair job was completed, the insurance company that insured the home issued a proof of loss and paid petitioner by draft.The drafts that the insurance companies issued to petitioner were *69 usually drawn on out-of-state banks and included both the contract price for dwelling repairs and the amounts due to the homeowner for damaged contents and living expenses.If petitioner had not already advanced the funds for contents and living expenses to the homeowners, he paid those amounts by his own personal checks. During 1964, petitioner made payments by check to fire repair customers for contents and living expenses in the total amount of $ 21,956.00. In any event, the portion of the insurance check for contents and living expenses was due and owing to the homeowner whereas the contract price for repair services was due and owing to petitioner. Petitioner also testified that he made some advance payments to fire repair customers even when they did not have insurance coverage for contents and living expenses.[8]
Petitioner did not deposit all of the drafts he received *70 from insurance companies in his bank accounts for Insured and Manufacturers. Many of petitioner's checks were bouncing in 1964 and 1965. At the same time petitioner was allegedly making large cash advances to home improvement and fire repair customers between 1963 and 1965, petitioner was in need of cash to pay the people on his payroll. During that period, a lot of petitioner's funds were tied up with jobs that were in progress and with Government savings bonds held jointly with his mother that he was unable to cash.He borrowed $ 2,500 from the National Bank of Detroit on January 28, 1963, which loan was secured by a mortgage on his home; and he borrowed $ 2,000 from his mother on December 8, 1964. Because petitioner did not receive the insurance drafts until three to six months after fire repair jobs were completed and since the drafts then did not clear the banking process for another 10 days to two weeks, petitioner devised a system of immediately obtaining cash from the drafts by giving his creditors the drafts. The creditor would apply a portion of the draft to petitioner's debt and give petitioner a check for the balance of the amount of the draft. Petitioner then deposited *71 these checks from his creditors in a new account he had opened at the Bank of Commonwealth. Petitioner apparently used that account at least in part to pay people on his payroll. As in his home modernization business, petitioner failed to keep adequate records for his fire repair business. Petitioner had Flora Hall maintain a file for each fire repair job. These files consisted of scraps of paper with handwritten notes allegedly showing contract prices, material purchases, payments to salesmen and workmen, and advances to customers for contents and living expenses.To supply respondent's agents with information on his fire repair operation, petitioner had Flora Hall and Edgar Goldman prepare summaries of his 1964 and 1965 job folders showing cash amounts paid to customers, salesmen, subcontractors, and other miscellaneous payees on each job. Petitioner gave respondent's agents these summaries and the job files used to prepare them in May of 1977. The summaries are mathematically correct and agree with the job files as interpreted by petitioner. These summaries listed total cash payments on fire repair jobs of $ 47,399 in 1964 and $ 14,760 in 1965.
Petitioner paid the accountant *72 Raymond Parker $ 100 each year to prepare his individual income tax returns for the taxable years 1959 through 1964. [9] Parker prepared petitioner's returns primarily by copying figures from written summaries that petitioner supplied to him. Parker also relied on petitioner's oral explanations and estimates of figures to prepare petitioner's returns. During this period, petitioner assured Parker that he had given him all gross receipts from his home improvement and fire repair operations. Parker did not question or verify petitioner's figures and accepted petitioner's figures and explanations. Petitioner testified at the trial that he also gave Parker records of illegal cash advances to home improvement customers and of cash payments to fire repair customers for contents and living expenses, and that Parker told him that he (Parker) would take care of both types of payments so that they did not appear *73 on the returns. Any illegal cash advances and fire repair cash payments were concealed on petitioner's tax returns by understating gross receipts and by overstating subcontractor costs. After Parker filled out each return using petitioner's figures and explanations, petitioner signed the completed return and mailed it without examining the figures on the return. [10]
Because of the inadequate books and records maintained by petitioner during 1965, his new return preparers, Norman Stricof, C.P.A., and Norman Gussin, were forced to use the bank deposits and expenditures method, as well as certain estimates from petitioner himself, in order to prepare petitioner's 1965 income tax return. Petitioner's 1965 tax return concealed any illegal cash advances and cash fire repair payments by understating gross receipts *74 and overstating subcontractor expenses. However, petitioner does not claim that these return preparers were aware of any illegal cash advances to home improvement customers or any cash payments to fire repair customers. The income tax returns filed by petitioner for the years 1959 through 1965, inclusive, showed the following figures: 1959
1960
1961
1. Gross Receipts
$ 210,526
$ 209,012
$ 222,960
2. Subcontractor
Costs
157,050
159,110
171,838
3. Split Profit or
Commission Expense
24,620
24,102
24,320
4. Cost of Goods
Sold
181,670
183,212
196,158
5. Gross Profits
28,856
25,800
26,802
6. Net Profits (Gross
Profits less other
Business Expenses)
11,322
10,634
10,476
7. Adjusted Gross Income
(Net Profits Plus Other
Profits or Losses)
10,781
9,973
10,358
8. Taxable Income
Reported (Adjusted
Gross Income less
Itemized Deductions)
8,581
7,776
6,405
1962
1963
1964
1965
1. Gross Receipts
$ 236,720
$ 245,140
$ 269,050
$ 403,180
2. Subcontractor
Costs
185,105
188,692
176,804
212,885
3. Split Profit or
Commission Expense
23,600
25,580
34,126
64,780
4. Cost of Goods
Sold
208,705
214,272
210,930
277,665
5. Gross Profits
28,015
30,868
58,120
125,515
6. Net Profits (Gross
Profits less other
Business Expenses
10,826
11,414
10,002
15,435
7. Adjusted Gross Income
(Net Profits Plus Other
Profits or Losses)
10,851
12,228
9,661
15,535
8. Taxable Income
Reported (Adjusted
Gross Income less
Itemized Deductions)
7,315
5,186
5,851
11,472
*75 In April of 1964, Revenue Agent Ronald Francisco was assigned to investigate petitioner's tax returns for 1962 and 1963. Francisco contacted petitioner for the first time in mid-November of 1964 and met with petitioner's accountant Parker three times in 1965. During the first meeting on January 27, 1965, Francisco asked Parker for petitioner's books and records for 1962 and 1963, and was told that petitioner did not have books and records in the normal sense. Parker gave Francisco his power of attorney dated January 26, 1965, to represent petitioner before respondent and also gave Francisco what materials he had for petitioner for 1962 and 1963. Those materials included the job book for 1962 and the columnar sheets Parker had prepared for both years. Those materials, which Francisco copied in longhand, showed the name and address of the home improvement customer, contract price, subcontractor cost, and profit (or split commission which was the same as the profit figure) for each job. Parker gave Francisco cancelled checks for subcontractor expenses for 1963 from which Francisco prepared a schedule. Parker also gave Francisco both cancelled checks and invoices for subcontractor *76 expenses for 1962, from which Francisco prepared a schedule. None of these materials contained any information in regard to any illegal cash advances or rebates. Francisco was not able to relate the checks he saw to individual jobs or to reconcile the materials he saw with the figures on the 1962 and 1963 tax returns. Francisco never saw those records after his second meeting with Parker on January 28, 1965. As indicated above, the materials shown to Francisco in January 1965 were the subject of the later summons issued to Parker and were the materials Parker turned over to petitioner and/or petitioner's attorney, Neal Zales. Since that time, neither the 1962 job book nor the columnar sheets prepared by Parker have ever been submitted to respondent, to the Court, or to petitioner's present counsel. Following his third meeting with Parker on May 13, 1965, by which time even the few records he had previously been shown were no longer available, Francisco concluded that petitioner's records were inadequate. Having learned at his second meeting with Parker that most of the home improvement jobs were financed with FHA loans, Francisco contacted the banks and obtained some of petitioner's *77 bank records. Those records consisted of ledger cards showing the gross amount of loans processed for petitioner by each bank and monthly reports of outstanding jobs on which loan payments were due from customers.
Francisco was immediately struck by petitioner's very large bank deposits compared to the figures on petitioner's tax returns for 1962 and 1963. Francisco compared the information in these bank records with the information in the handwritten copies he had made of Parker's records.He found there were many more customers and jobs listed in the bank records than had been listed on Parker's compilations. Based on his comparisons, Francisco concluded that petitioner had failed to report on his tax returns proceeds from about 20 jobs in 1962 and from about 30 jobs in 1963. Francisco was able to verify all of the commissions (split profits) reported on the 1962 return because commissions in that amount of $ 23,600 were paid by check by petitioner. Parker's compilation of home improvement jobs indicated some 25 jobs where no commissions were paid by petitioner, but Francisco could not determine whether any commissions had been paid on the jobs that had been omitted from the *78 tax returns. Throughout his entire examination, Francisco was not aware that petitioner had made any illegal cash advances or paid any rebates to his customers and did not see any documents that suggested that any illegal cash payments or rebates had been made. Francisco was concerned about the large omissions of income from petitioner's 1962 and 1963 returns. In June of 1965, Francisco referred petitioner's case to respondent's Intelligence Division for a criminal investigation. Intelligence accepted the case on or about July 14, 1965, and assigned the case to special agent Richard Daguanno. Francisco worked with Daguanno until sometime prior to the commencement of the civil fraud case against petitioner. Daguanno calculated petitioner's income for 1962 and 1963 using the bank deposits and expenditures method and prepared summaries in support of that determination using petitioner's bank records. Those summaries listed petitioner's total loan proceeds, reported loan proceeds on his returns, and unreported loan proceeds on each job. [11]
*79 During his investigation, Daguanno discovered that petitioner had performed services for Francis Construction Company in 1962 and 1963 for which he received checks in the amounts of $ 3,394.78 and $ 15,402.89, respectively, and that petitioner had failed to report the amounts received as income on his tax returns, had failed to deposit those checks in his bank accounts, and had used those checks to pay for supplies he had purchased from United Products Company. Petitioner endorsed and returned those checks to the owner of Francis Construction Company, Philip Kanat, who was also the owner of United Products. In 1967, Daguanno conducted a survey to determine whether or not home improvement customers of Insured had received cash advances or rebates from petitioner during 1962 and 1963. Daguanno found that eight of 115 (7 percent) of petitioner's customers who responded to Daguanno reported receiving total advances of $ 5,082 in 1962, and 12 of 140 (9 percent) of petitioner's customers who responded to Daguanno reported receiving total advances of $ 6,050 in 1963. Daguanno thus allowed advances in those amounts for purposes of the criminal trial. Revenue Agent Michael Cinnamon *80 first became involved in petitioner's case in 1965 and 1966 by assisting Francisco and later Daguanno. Cinnamon later prepared the entire revenue agent's report on which the statutory notice herein is based. Cinnamon's report was dated March 9, 1967, and the statutory notice based upon that report was dated September 30, 1975. Using information obtained from petitioner's then accountants (Stricof and Gussin) who had prepared the 1965 return using a bank deposits method, and also information from petitioner's banks, Cinnamon determined petitioner's total business receipts for the years 1959 through 1965 under the bank deposits method as follows: 1959
1960
Deposits: 1. National Bank of Detroit--Checking
Account of Insured
$ 234,359.03
$ 242,887.87
2. Manufacturers National Bank--Checking
Account of
Manufacturers
3. Total:
$ 234,359.03
$ 242,887.87
Less Non-Income Deposits
and Non-Business Deposits: 1. Transfers Between
Commercial Checking
Accounts
2. Payments To Fire Repair
Customers For Contents-- &
Living Expenses
3. Transfers From Savings
Accounts [13]
4. Rental Income Reported
In Separate Schedule
1,740.00
1,505.00
Net Business Deposits:
$ 232,619.03
$ 241,382.87
Add Business Receipts Not
Deposited: 1. Sales Financed Through [14]
Francis Construction
Company
2. Sales Self-Financed [15]
3. Fire Repair Sales Net of
an Allowance For Contents--Living
Expense Payments
TOTAL BUSINESS RECEIPTS
DETERMINED:
$ 232,619.03
$ 241,382.87
*81 1961
1962
Deposits: 1. National Bank of Detroit--Checking
Account of Insured
$ 242,108.85
$ 280,637.77
2. Manufacturers National Bank--Checking
Account of
Manufacturers
3. Total:
$ 242,108.85
$ 280,637.77
Less Non-Income Deposits
and Non-Business Deposits: 1. Transfers Between
Commercial Checking
Accounts
2. Payments To Fire Repair
Customers For Contents-- &
Living Expenses
3. Transfers From Savings
Accounts [13]
4. Rental Income Reported
In Separate Schedule
1,860.00
1,860.00
Net Business Deposits:
$ 240,248.85
$ 278,777.77
Add Business Receipts Not
Deposited: 1. Sales Financed Through [14]
Francis Construction
Company
$ 3,394.78
2. Sales Self-Financed [15]
131.50
3.Fire Repair Sales Net of
an Allowance For Contents--Living
Expense Payments
TOTAL BUSINESS RECEIPTS
DETERMINED:
$ 240.248.85
$ 282,304.05
1963
1964
1965 [12]
Deposits: 1. National Bank of Detroit--Checking
Account of Insured
$ 203,382.32
$ 208,698.29
$ 375,323.80
2. Manufacturers National Bank--Checking
Account of
Manufacturers
182,517.81
278,017.60
356,651.36
3.Total:
$ 385,900.13
$ 486,715.89
$ 731,975.16
Less Non-Income Deposits
and Non-Business Deposits: 1. Transfers Between
Commercial Checking
Accounts
73,050.00
70,753.00
165,300.00
2. Payments To Fire Repair
Customer For Contents-- &
Living Expenses
61,726.98
3. Transfers From Savings
Accounts [13]
1,200.00
15,870.00
15,900.00
4. Rental Income Reported
In Separate Schedule
1,460.00
1,480.00
1,240.00
Net Business Deposits:
$ 310,190.13
$ 398,612.89
$ 487,808.18
Add Business Receipts Not
Deposited: 1. Sales Financed Through [14]
Francis Construction
Company
$ 15,402.89
2. Sales Self-Financed [15]
187.44
$ 127.75
3. Fire Repair Sales Net of
an Allowance For Contents--Living
Expense Payments
$ 42,946.63
TOTAL BUSINESS RECEIPTS
DETERMINED:
$ 325,780.46
$ 441,559.52
$ 487,935.93
*82 Cinnamon also allowed 71 or 72 percent of petitioner's claimed subcontract costs from 1959 through 1964 and a larger percentage in 1965: Subcontract Costs Claimed
Subcontract Costs Allowed
Year
on Petitioner's Tax Returns
in Statutory Notice
1959
$ 157,050
$ 113,076.00
1960
159,110
114,560,00
1961
171,838
123,724.00
1962
185,105
130,304.85
1963
188,692
135,668.80
1964
176,804
127,299.00
1965
212,885
182,394.07
The subcontract costs allowed by Cinnamon included substantial amounts which were unsubstantiated. *83 For the years 1959, 1960, 1961, and 1964, there were no records at all to establish subcontractor costs, but Cinnamon allowed substantial amounts (over $ 100,000 each year) because the nature of petitioner's operation suggested that substantial subcontractor expenses would normally be incurred. Among the subcontractor expenses disallowed for 1962 and 1963 were certain fictitious invoices, including invoices from Varsity Construction Company, an inactive company set up by petitioner. Based on Cinnamon's bank deposits analysis of business receipts, allowance of subcontract costs, and adjustments to nonbusiness items, respondent determined understatements in petitioner's taxable income for 1959 through 1965 on his statutory notice as follows: Total Under-statements
Unreported Business
Nonbusiness
of
Year
Income [16]
Adjustments
Taxable Income
1959
$ 74,869.03
$ 969.00
$ 75,838.03
1960
83,246.62
1,131.62
84,378.24
1961
72,463.84
2,875.14
75,338.98
1962
[17] 107,849.25
[17] 2,692.14
110,541.39
1963
144,394.92
5,852.00
150,246.92
1964
243,455.77
3,151.00
246,606.77
1965
130,066.93
2,548.41
132,615.34
*84 Sometime after Edgar Goldman filed a protest letter on petitioner's behalf in August of 1972, the case was assigned to Rubin Berman as district conferee to dispose of nonagreed issues for 1962 and 1963 in Revenue Agent Cinnamon's report for the years 1962 and 1963. In addition to the protest letter, Berman received a number of documents, including a list of job contracts for 1962 and 1963 and Goldman's summaries of job records for 1962 and 1963, i.e. Goldman's summaries of the job estimate worksheets. Berman examined these materials prior to the conference with Goldman and two of petitioner's attorneys, Fred Walker and David Lieberman. The protest letter dated August 25, 1972, argued that gross receipts, subcontract cost, and business expense figures on petitioner's returns were incorrect but that the taxable income amounts reported on the returns were correct. During the conference, petitioner's agents explained that gross receipts and subcontractor cost figures on the returns were falsified in order to conceal the illegal cash advances to customers. This was the first time that petitioner or any of his representatives had ever suggested to respondent that there had been any *85 illegal cash payments to the home improvement customers. However, Berman took the position that such illegal cash advances or rebates would violate public policy, and he did not reach the issue as to whether or not those advances or rebates had in fact been paid. He refused to allow them and referred the case to the Appellate Division. Appeals Officer Frank Vukovich was assigned to examine petitioner's case after the district conference. During several conferences, petitioner's agents told Vukovich that gross receipts were understated and subcontract costs were overstated on petitioner's 1962 and 1963 returns in order to offset illegal cash advances made during those years. Goldman gave Vukovich lists of claimed illegal cash advances for 1962 and 1963 at their first conference.Vukovich pointed out that even if those advances were allowed, they would not account for the discrepancies in the bank deposits as determined by the revenue agent.Goldman's summaries of advances for 1961 through 1965 were later given to Vukovich by regional counsel at a stipulation of facts conference in connection with the trial of this case. However, Vukovich had been furnished Goldman's summaries for *86 1961 and 1966 that Goldman had prepared at the same time as he prepared the summaries for 1962 and 1963. The record does not show exactly when Goldman prepared the summaries for 1964 and 1965, but the parties stipulated that all of Goldman's summaries for 1961-1965 (as retyped by Flora Hall) were submitted to the Internal Revenue Service somtime after June of 1973. Vukovich had requested the Audit Division to make available the services of a revenue agent to make certain verifications, and Revenue Agent Henry Aouate was assigned to do so in the summer of 1974. Aouate received from David Lieberman one or two boxes containing assorted documents belonging to petitioner for the various years. The materials were all jumbled together when Aouate received them and were in very bad condition. He sorted and organized the materials, and the parties have stipulated that he received the following materials: job estimate work sheets for the years 1961-1965, fire repair folders for fire repair jobs completed in 1964 and 1965, cancelled checks for materials and subcontractor expenses of $ 75,809.86 for 1961 and $ 185,980 for 1964, some additional cancelled checks for 1961 and 1964 relating *87 to business expense deductions agreed upon by the parties, a cash daybook covering a four-month period in 1964, and affidavits from customers and salesmen covering the years 1962, 1963, and 1964 indicating that payments had been made to the customers. Since Aouate received no third-party documention showing that cash advances had been made, in July of 1974 he interviewed 20 to 30 of petitioner's customers whom he could still locate to determine whether such advances were made. Most of the customers interviewed had contracted with petitioner for home improvement jobs in 1964 or 1965. Petitioner was not told of these interviews ahead of time. Of the customers questioned who could or would answer, 10 stated that they had received cash advances and five denied receiving such advances. Nevertheless, no customer had receipts to prove that he had received an advance and no customer recalled the exact amount of the advance that was listed for him in petitioner's job estimate work sheets or in the summaries thereof. Pursuant to the request of this Court and in an attempt to limit the number of witnesses to be called, Revenue Agent James T. Miller was assigned in 1977 to verify the *88 accuracy of petitioner's summaries of his records and to conduct joint interviews with petitioner and selected customers to determine whether cash advances were made. Miller concluded that petitioner's summaries were accurate compilations of petitioner's job estimate work sheets for 1961 through 1965, as those work sheets were interpreted by petitioner. Miller also determined that there were additional checks for subcontract expenses in petitioner's records for 1964 and 1965 in the respective amounts of $ 58,681 and $ 20,490.93. Miller thus increased petitioner's allowable subcontract expenses to the total amounts of $ 185,980 in 1964 and $ 202,885 in 1965. Miller also determined that petitioner was entitled to the following additional costs during 1964: (1) $ 2,747.50 for checks to salesmen for commissions and split profits on jobs; and (2) $ 1,050.73 for petitioner's repurchase of an uncollectible account that had been financed through the City National Bank of Detroit. Most of these items were incorporated in Goldman's reconciliation of gross income and explanation of understatements of income as set out below. With respect to the 1977 survey of petitioner's customers, Miller *89 decided the number and names of the customers to be interviewed. Miller and petitioner jointly interviewed 30 home improvement customers, including all of those who had been questioned by Special Agent Daguanno in 1967. All except two to four customers stated that they had received advances. However, as in Aouate's survey, none of the customers questioned (1) remembered the exact amount of advances received, or (2) had receipts showing such advances. During these interviews, the customers tended to agree with whatever figure petitioner suggested to them from his job estimate work sheets. These same customers had, during Daguanno's 1967 survey, denied receiving any cash advances. Petitioner testified at the trial that he had told these customers in 1967 to deny receiving advances in order to avoid an FHA prosecution. During the 1977 interviews, petitioner assured the customers that the statute of limitations had already run on any FHA violations. Nevertheless, Miller was unable to determine whether petitioner's customers were lying in 1967 or were lying in 1977. In addition to summaries, Goldman prepared and submitted at trial an analysis of the understatements of taxable *90 income determined by respondent for the years 1961 through 1965. Goldman did not question respondent's increases in net business deposits or respondent's decreases in subcontractor costs. After listing those differences between gross receipts and subcontract costs as reported by petitioner on his returns and as determined by respondent, Goldman's reconciliation of gross income and explanations of the understatements of income were as follows: 1961
1962
Respondent's Figures
$ 65,402
$ 96,857
Goldman's Explanations
1. Home Modernization
Payments
$ 83,530
$ 90,713
2. Fire Repair Payments
to Homeowners
3.Loans
4. Checks to Cash
Endorsed by Third
Parties
5. Subcontract
Costs
6. Commissions
7. Cash Advances
and Reimbursements
To Employees
* 8,085
TOTAL EXPLANATION
$ 83,530
$ 98,798
1963
1964
1965
Respondent's Figures
$ 118,073
$ 179,067
$ 115,119
Goldman's Explanations
1. Home Modernization
Payments
$ 101,715
$ 53,218
$ 62,890
2. Fire Repair Payments
47,399 (Cash)
14,760 (Cash)
to Homeowners
21,956 (Checks) *
3. Loans
2,500
2,000
4. Checks to Cash
Endorsed by Third
Parties
9,073
5. Subcontract
Costs
58,681 *
20,491 *
6. Commissions
2,747 *
7. Cash Advances
and Reimbursements
To Employees
* 6,804
TOTAL EXPLANATION
$ 111,019
$ 195,074
$ 98,141
*91 No similar compilation or explanation was presented for the years 1959 and 1960.The above tabulation prepared by Goldman for the trial incorporates various items to which the parties stipulated. The only items remaining in dispute are (1) the claimed home modernization payments, i.e., the alleged illegal cash advances or rebates to the home improvement customers for each year, and (2) the cash remittances on fire repair jobs. In each instance the figures used by Goldman are a mathematically correct summary of petitioner's job estimate work sheets on the home improvement jobs as interpreted by petitioner and a mathematically correct summary of petitioner's fire repair job files as interpreted by petitioner. However, Goldman could not have interpreted those files without petitioner's explanations. The assessment and collection of all additional tax from petitioner for the years 1959 through 1965 are barred by the statute of limitations in the absence of fraud. ULTIMATE FINDINGS *92 OF FACT There are deficiencies in petitioner's income taxes for the years 1959 through 1965. Part of petitioner's underpayment of tax for each of the years 1959 through 1965 was due to fraud with intent to evade tax within the meaning of section 6653(b). OPINION The first issue to be decided is whether respondent correctly determined deficiencies in petitioner's income taxes for the years 1959 through 1965. Throughout the years in issue, petitioner failed to maintain books and records adequate to establish the amount of his gross income. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Petitioner did not have or at least did not produce any business records for the years 1959 and 1960. The record herein contains such documents only for the years 1961 through 1965.Petitioner's business records, such as they are, are in summary form, are without underlying primary documentation in support, and are not contemporaneously prepared original books of entry. Petitioner has conceded that the gross receipts and subcontract cost figures reported on his tax returns are incorrect, and we have been unable to reconcile those figures with corresponding figures *93 in petitioner's records. Moreover, despite petitioner's failure to submit adequate records in this case, petitioner testified that he still has many of his original business records available at his office.
Where a taxpayer fails to keep adequate books and records and the records kept do not correctly reflect his income, respondent is authorized by section 446 to reconstruct the taxpayer's income in accordance with such method as in his opinion does clearly reflect income. This Court has consistently held that the bank deposits and expenditures method used by respondent herein is a proper method of reconstructing a taxpayer's income. Respondent's bank deposits determination of the deficiencies herein is presumptively correct, and petitioner has the burden of showing that that determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; Mills v. Commissioner, 399 F. 2d 744, 749 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; Marcello v. Commissioner, 380 F. 2d 494, 496-497 (5th Cir. 1967), revg. on other grounds a Memorandum *94 Opinion of this Court; Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F. 2d 2 (6th Cir. 1977). Initially, we note that respondent's original bank deposits determination must be adjusted to the extent that the parties have now stipulated to the following items: (1) cash advances and reimbursements to employees of $ 8,085.09 during 1962 and $ 6,804 during 1963 which increases other business deductions for those years; (2) payment for repurchase of an uncollectible account in the amount of $ 1,050.73 during 1964 which increases other business deductions by that amount; (3) additional commissions and split profits on jobs to salesmen by check of $ 2,747.50 during 1964 which increases the total deduction for that item to $ 36,873.50; (4) contents and living expense payments to fire repair customers by check of $ 21,956 during 1964 which reduces gross receipts by that amount; and (5) additional subcontract costs of $ 58,681 during 1964 and $ 20,490.93 during 1965. Respondent conceded these items after receiving additional records from petitioner's representatives after the statutory notice herein had been issued. Accordingly, we *95 have adjusted respondent's deficiency determinations for the years 1962 through 1965 to reflect these stipulated amounts as follows: 1962
1963
1. Gross
Receipts
$ 282,304.05
$ 325,780.46
2. Subcontract
Costs
130,304.85
135,668.80
3. Commissions/
Split Profits
23,600.00
25,580.00
4. Cost of Goods
Sold (2 + 3)
$ 153,904.85
$ 161,248.80
5.Gross Profits (1-4)
128,399.20
164,531.66
6. Other Business
Deductions
* 17,709.04
* 15,526.74
7. Net Profit (5 - 6)
$ 110,690.16
$ 149,004.92
8. Reported Net
Profit
10,926.00
11,414.00
9. Unreported Net
Profit
$ 99,764.16
$ 137,590.92
10. Nonbusiness
Adjustments
2,692.14
5,852.00
11. Taxable Income
Reported
7,315.00
5,186.00
12. Total Taxable
Income Determined
(sum of 9, 10, & 11)
$ 109,771.30
$ 148,628.92
13. UNREPORTED
TAXABLE INCOME
(Sum of 9 and
10 or 12 minus
11)
$ 102,456.30
$ 143,442.92
1964
1965
1. Gross
Receipts
* $ 419,603.52
$ 487,935.93
2. Subcontract
Costs
* 185,980.00
* 202,885.00
3. Commissions/
Split Profits
* 36,873.50
64,780.00
4.Cost of Goods
Sold (2 + 3)
$ 222,853.50
$ 267,665.00
5. Gross Profits (1-4)
196,750.02
220,270.93
6. Other Business
Deductions
* 27,727.48
95,259.43
7. Net Profit (5 - 6)
$ 169,022.54
$ 125,011.50
8.Reported Net
Profit
10,002.00
15,435.00
9. Unreported Net
Profit
$ 159,020.54
$ 109,576.50
10. Nonbusiness
Adjustments
3,151.00
2,548.41
11. Taxable Income
Reported
5,851.00
11,472.00
12. Total Taxable
Income Determined
(sum of 9, 10, & 11)
$ 168,022.54
$ 123,596.91
13. UNREPORTED
TAXABLE INCOME
(Sum of 9 and
10 or 12 minus
11)
$ 162,171.54
$ 112,124.91
*96 Before examining petitioner's evidence, we note that even though respondent's original bank deposits determination is not completely accurate due to the above concessions, the presumption supporting respondent's determination as to other items is not destroyed and an assessment based on that determination would not be arbitrary, particularly since petitioner withheld tht records on which respondent later based his concessions. Petitioner thus has the burden of proving that the items in respondent's determination that have not been conceded are erroneous. Mills v. Commissioner, supra at 749; Marcello v. Commissioner, supra at 497; Roberts v. Commissioner, 62 T.C. 834, 836-837 (1974). Petitioner has failed to submit persuasive proof that respondent's determination with respect to the other items in issue is incorrect. Other than petitioner's vague and self-serving testimony that he began making cash advances to home improvement *97 customers when he first went into business for himself in 1953, petitioner presented no specific evidence negating any of the deficiencies determined by respondent for the years 1959 and 1960. Petitioner has also failed to show that the following items, which respondent determined were not deposited in any of petitioner's bank accunts, either did not constitute gross income to him in the first place, or, in the alternative, were already included in gross receipts reported on his returns: (1) checks from Francis Construction Company that petitioner received for his services and used to pay for building supplies from United Products Corporation in the amount of $ 3,394.78 during 1962 and $ 15,402.89 during 1963; (2) proceeds from sales that petitioner financed through Francis on behalf of customers who could not get commercial loans in the amount of $ 131.50 during 1962, $ 187.44 during 1963, and $ 127.75 during 1965; and (3) proceeds that petitioner received from fire repair sales which, after allowance for contents and living expense payments to customers, totalled $ 42,946.63 during 1964. With respect to the years 1961 through 1965, petitioner submitted written summaries of proceeds *98 and cash advances on home improvement jobs and a written analysis purporting to reconcile gross income as reported on petitioner's return with understatements as determined by respondent. All of these documents were prepared by petitioner's accountant, Edgar Goldman, between the issuance of the 30-day letter and the trial in this case. In making these records, Goldman relied on petitioner's own sketchy records and self-serving explanations. The first claim in Goldman's analysis is that respondent's determination of gross receipts in 1963 and 1964 should be reduced to take into account a $ 2,500 loan from a bank in 1963 and $ 2,000 loan from petitioner's mother in 1964. However, petitioner has failed to produce any evidence showing: (1) that he had not previously deducted these items as subcontract or business expenses, or (2) that respondent had ever included these items in his bank deposits determination of business receipts for those years in the first place. The second disputed itme in Goldman's reconciliation is $ 9,073 of additional costs during 1964 listed as "checks to cash endorsed by third parties," including salesmen, subcontractors, and customers. The parties have *99 stipulated that there were such checks to cash totalling $ 9,073.75 for the year 1964.Petitioner has not proved, however, that he used these checks to cash to pay business expenses, and, if so, whether he had already included these items in the subcontract and commission costs listed on his return. Moreover, assuming some of these checks were used to pay customers, petitioner failed to prove whether or not he also listed these items under his separate headings for claimed remittances to home improvement and fire repair customers. The major items in Goldman's attempted reconciliation are the purported cash payments, principally the alleged illegal cash payments or rebates to the home improvement customers for the years 1961 through 1965 and the alleged cash payments to the fire repair customers for the years 1964 and 1965 as follows: Years
1961
1962
1963
Alleged Illegal
Payments or Rebates
to Home Improvement
Customers
$ 83,530
$ 90,713
$ 101,715
Alleged Cash Payments
to Fire Repair Customers
Totals
$ 83,530
$ 90,713
$ 101,715
Years
1964
1965
Alleged Illegal
Payments or Rebates
to Home Improvement
Customers
$ 53,218
$ 62,890
Alleged Cash Payments
to Fire Repair Customers
47,399
14,760
Totals
$ 100,617
$ 77,650
*100 How petitioner allegedly obtained these large sums of cash from the amounts deposited in his bank accounts was never really explained. Presumably, petitioner obtained such funds by checks made out to cash, but petitioner did not produce the cancelled checks to cash to establish a source for these alleged cash payments. For example, for 1964, where total cash payments of over $ 100,000 are claimed, the parties have stipulated to checks made out to cash and endorsed by salesmen, subcontractors, and customers in the total amount of only $ 9,073.75. In addition, all of the figures that petitioner has submitted to the Court in an attempt to establish the amount of illegal cash advances or rebates to home improvement customers or cash payments to fire repair customers are based entirely upon the summaries prepared by Goldman. Those summaries in turn are based entirely upon petitioner's interpretation of (1) his job estimate work sheets and (2) the scraps of paper that comprised his fire repair records. Representative samples of the job estimate work sheets that were introduced into evidence could more properly be described as "scribble sheets," as one witness called them, rather than *101 business records. Neither the Court nor any of petitioner's witnesses who worked with these records could interpret these sheets without accepting petitioner's explanation as to what the figures meant.Petitioner's own witness, the accountant Edgar Goldman, admitted that he could not have understood the job estimate work sheets and fire repair records without petitioner's help.Furthermore, there were no records for Mr. Goldman to use to make summaries of alleged illegal cash advances or rebates for the years 1959 and 1960. Thus, the underlying support for petitioner's claimed cash payments rests on petitioner's credibility and, to a lesser extent, on the credibility of one of his salesmen and his secretary who testified at the trial. As will be developed more fully below in the discussion of the fraud issue, the Court found petitioner wholly unworthy of belief, and did not find the salesman or the secretary to be particularly credible witnesses. Nevertheless, at this point, the Court will merely address the matter of the amount of tax deficiencies for each year. Returning to the major items disputed in Goldman's analysis, the third claimed item is cash payments to fire repair *102 customers for contents and living expenses of $ 47,399 in 1964 and $ 14,760 in 1965. After examining records from petitioner and various fire insurance adjustors, respondent allowed petitioner payments of $ 21,956 by checks during 1964, one of the stipulated items discussed above, and $ 61,726.98 during 1965, one of the items allowed in the statutory notice. There is no evidence in this record that petitioner made any payments in excess of these amounts allowed by respondent for each year. The principal items in dispute in Goldman's analysis are the alleged illegal cash advances or rebates to home improvement customers. Two of petitioner's employees, salesman Bernard Moss and secretary Flora Hall, attempted to corroborate petitioner's testimony that he made cash advances in his home improvement business. At the times in 1964 and 1965 that the secretary was working with petitioner's records, she knew so little about the records and petitioner's business as to make her conclusions as to what was going on wholly unreliable. The salesman's testimony that he knew about and participated in the FHA frauds and that everyone in the home improvement industry in the Detroit area during *103 those years was doing the same thing did not inspire confidence in his veracity. In any event, his testimony was vague, generalized, and lacking in any meaningful detail. The only written records of petitioner's claimed advances were the summaries prepared by Goldman from petitioner's inadequate records and personal interpretations, discussed above. Other than his own self-serving testimony, however, petitioner failed to present any original records or third-party documentation in support of these claimed advances. The three surveys conducted by respondent's agents to determine whether and, if so, to what extent petitioner made cash advances to his home improvement customers are inconclusive. In the first place, the responses received by the three agents who conducted surveys are inconsistent: Year in
Revenue
Which Survey
Year(s)
Customers
Agent
Conducted
Surveyed
Responding
Daguanno
1967
1962
115
Daguanno
1967
1963
140
Aouate
1974
1964/1965
15
Miller
1977
1962/1963
30
Percentage
Customers
Customers Not
Customers
Revenue
Receiving
Receiving
Receiving
Agent
Advances
Advances
Advances
Daguanno
8
107
7%
Daguanno
11
129
8%
Aouate
10
[18] 5
67%
Miller
26 to 28
2 to 4
87 to 93%
*104 Petitioner attempted to explain the differing results of these surveys by stating that he instructed his customers to lie to respondent's agents in 1967 and deny receiving advances in order that he would then avoid an FHA prosecution. However, petitioner was not a forthright witness, and in view of his false statements to respondent and the FBI prior to 1972 to protect himself from an FHA suit, we cannot conclude that he made the cash advances claimed herein now that he wants to prevent respondent's assessment of deficiencies in tax and civil fraud penalties. While the record as a whole shows that some illegal cash payments or rebates were undoubtedly made to some of petitioner's customers in some years, there is nothing to establish the large amounts that petitioner claims. Similarly, *105 there is nothing in the record that would permit the Court under the Cohan rule to reduce the proposed deficiencies for some amount of cash payments. Cohan v. Commissioner, 39 F. 2d 540 (2d Cir. 1930). The Court may not be compelled to guess or estimate, for the basic requirement for Cohan to be applied is that there be sufficient evidence to satisfy the trier of fact that at least the amount of illegal cash payments or rebates allowed in the estimate was in fact made. Williams v. United States, 245 F. 2d 559, 560 (5th Cir. 1957). Relying on Richardson v. Commissioner, 264 F. 2d 400 (4th Cir. 1959), and Perez v. Commissioner, T.C. Memo. 1974-211, petitioner argues that the burden of proving whether or not advances were made to home improvement customers should be shifted to respondent. In Perez, we recognized the general rule that once respondent shows that a taxpayer has unreported income and allows the deductions claimed on the return, he does not have the further burden of proving that the taxpayer does *106 not have any additional unclaimed deductions that would offset such unreported income. In both Perez and Richardson, however, the courts acknowledged that understatements of gross receipts, standing alone, did not establish that a taxpayer fraudulently intended to evade tax where he also proved that he had offsetting deductions related to such receipts that he had failed to claim on his return. The taxpayers in Perez and Richardson submitted positive proof that payments for commissions and salaries were made, were deductible, and were related to and responsible for their respective unreported receipts. Based on such proof, the courts refused to follow the general rule placing the burden of proving that such payments were made on petitioner and held that in order for a fraud penalty to be assessed where unreported items of income and expense are closely related, respondent must prove that at least some unreported net income resulted from the unreported transactions. Richardson v. Commissioner, supra at 405. [19]
The facts in the present *107 case, however, are distinguishable from those in Perez and Richardson. Although petitioner's claimed advances were at least partially related to and responsible for his unreported gross receipts and were arguably an item that could have been offset against gross receipts, petitioner failed to submit any credible evidence of whether and to what extent he made such advances.Accordingly, since petitioner failed to sustain his burden of proving that his claimed advances were made in the first place, we refuse to shift the burden to respondent to show that these unsubstantiated advances were not made. The next question is whether any part of petitioner's underpayment of tax for each of the years involved was due to fraud with intent to evade tax under section 6653(b). The issue of fraud is one of fact to be decided based on a consideration of the entire record herein. The burden of proving fraud is placed on respondent by section 7454(a). Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971); Stratton v. Commissioner, 54 T.C. 255, 285 (1970); *108 10 Mertens, Law of Federal Income Taxation, sec. 55.10, p. 45 (1976 rev.). Fraud is never presumed, and it must be affirmatively established by respondent with clear and convincing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure. Fraudulent intent of the taxpayer in filing his returns is the essential element in respondent's proof of fraud, and that intent has been defined as the specific purpose to evade taxes believed to be owing. Direct evidence of fraudulent intent is seldom available, and the existence of such intent must be determined by examining the facts and circumstances surrounding the conduct of petitioner and his business and the preparation of the alleged fraudulent returns. Respondent must prove fraud in each year, and proof of fraud in one year will not sustain respondent's burden of proving fraud in another year. Foster v. Commissioner, 391 F. 2d 727, 733 (4th Cir. 1968); Drieborg v. Commissioner, 225 F. 2d 216, 220 (6th Cir. 1955); Mitchell v. Commissioner, 118 F. 2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); Estate of Beck v. Commissioner, supra at 363. *109 In a civil tax fraud case, consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent. Holland v. United States, 348 U.S. 121, 139 (1954); Kurnick v. Commissioner, 232 F. 2d 678, 681 (6th Cir. 1956), affg. a Memorandum Opinion of this Court; Estate of Beck v. Commissioner, supra at 364; Harper v. Commissioner, 54 T.C. 1121, 1139 (1970). As our findings clearly demonstrate, petitioner herein has consistently and substantially understated his taxable income during each of the seven consecutive years in issue. Even if we were to accept petitioner's arguments that the understatements of taxable income resulted from the cash advances or rebates to home improvement customers and the cash payments to fire repair customers, that the advances were concealed on his returns to avoid FHA prosecution, and that the cash advances or payments were made in the amounts he and Goldman claimed, there would still remain substantial unexplained understatements *110 of taxable income for six of the seven years in question as follows: 1959
1960
1961
1. Unreported Taxable
Income (Stat. Notice
adjusted for respondent's
concessions and Court's
disallowances of all items
discussed above, except
home improvement and fire
repair payments)
$ 75,838.03
$ 84,378.24
$ 75,338.98 2. Petitioner's Explanation
(advances to home improvement
cusomters and cash
payments to fire repair
customers)
83,530.00 3. Unexplained amounts of
unreported taxable income
$ 75,838.03
$ 84,378.24
($ 8,191.02)
1962
1963
1. Unreported Taxable
Income (Stat. Notice
adjusted for respondent's
concessions and Court's
disallowances of all items
discussed above, except
home improvement and fire
repair payments)
$ 102,456.30
$ 140,942.92
2. Petitioner's Explanation
(advances to home improvement
customers and cash
payments to fire repair
customers)
90,713.00
101,715.00
3. Unexplained amounts of
unreported taxable income
$ 11,743.30
$ 39,227.92
1964
1965
1. Unreported Taxable
Income (Stat. Notice
adjusted for respondent's
concessions and Court's
disallowances of all items
discussed above, except
home improvement and fire
repair payments)
$ 151,098.54
$ 112,124.91
2. Petitioner's Explanation
(advances to home improvement
customers and cash
payments to fire repair
customers)
100,617.00
77,650.00
3. Unexplained amounts of
unreported taxable income
$ 50,481.54
$ 34,474.91
*111 This Court has repeatedly held that a taxpayer's failure to overcome the presumptive correctness of respondent's deficiency determinations is not of itself sufficint proof that any part of those deficiencies was due to the taxpayer's fraud.To hold otherwise, we would have to ignore respondent's burden of proving fraud by clear and convincing evidence under section 7454(a) and Rule 142(b), Tax Court Rules of Practice and Procedure. However, proof of consistent and substantial understatmnts of income over several consecutive years may be substantial evidence of fraud, if, together with additional independent evidence, they show an intention to evade taxes. George v. Commissioner, 338 F. 2d 221, 223 (1st Cir. 1964), revg. a Memorandum Opinion of this Court; Kashat v. Commissioner, 229 F. 2d 282, 285 (6th Cir. 1956), revg. a Memorandum Opinion of this Court; Drieborg v. Commissioner, supra at 218; Estate of Beck v. Commissioner, supra at 363. In addition to the consistent pattern of substantial understatements, *112 the record herein contains additional facts and convincing circumstantial evidence that show that respondent has met his burden of establishing that petitioner knowingly and intentionally evaded his taxes during the taxable years 1959 through 1965, inclusive. The first circumstantial fact indicative of fraud is petitioner's repeated concealment and misrepresentations both on his tax returns and during the investigation of those returns. Estate of Beck v. Commissioner, supra at 365-366; Harper v. Commissioner, supra at 1142; Sunbrock v. Commissioner, 48 T.C. 55, 65-66 (1967). Petitioner's conduct during respondent's investigation was designed to conceal facts from respondent's agents.In this connection, when agent Francisco told petitioner's accountant Parker that he wanted to reexamine petitioner's books and records for 1962 and 1963 and another agent issued a summons for those documents, neither petitioner nor Parker made them available. There then commenced virtually a pattern of deception, with the records being transferred from accountant or attorney to accountant or attorney to keep the records out of respondent's *113 hands. Nevertheless, petitioner told respondent's agents (1) that he never saw these records after July or August of 1965, and (2) that these records were passed on to four of petitioner's attorneys. Petitioner's unconvincing explanation for these conflicting statements is that one of his attorneys told him at the time of a conversation between the attorney and special agent Daguanno on June 2, 1966, to lie and to deny having any records. That attorney had died by the time of the trial of this case. Some of the records agent Francisco examined have never surfaced again, and have not been provided to respondent's agents, to the Court, or to petitioner's present counsel. Other records finally ended up in the hands of Mr. Goldman and petitioner's present counsel sometime in mid 1972. The record also shows that petitioner's returns were prepared by accountants Raymond Parker, Norman Stricof, and Norman Gussin. However, petitioner himself prepared virtually all of the records for his business such as they were. Neither respondent's agents nor this Court has been able to reconcile the figures on the summaries of petitioner's records with the figures on his tax returns for the years *114 1961 through 1965. Moreover, petitioner testified that he (1) supplied his return preparers with all of the information to prepare his returns; (2) depended upon Parker to conceal illegal advances on his returns and received Parker's assurance that he would do so; and (3) signed and mailed the completed returns without examining his accountant's figures. In spite of these alleged practices, petitioner testified that he knew he paid the correct amount of income taxes for each year. The Court did not believe petitioner's testimony or his self-serving conclusion. More importantly, it appears from the record as a whole that petitioner's return preparers simply used summaries and estimates furnished by petitioner himself and any understatements of gross receipts, overstatements of subcontractor expenses, or understatements of taxable income came from petitioner himself.Petitioner's attempt to portray himself as an unschooled person relying on his accountants to keep him out of trouble with the Revenue Service is to say the least disingenuous. On this record, we are satisfied that petitioner furnished his accountants only with such items and amounts as he desired to have shown on *115 his tax returns, caused his accountants to report false figures on his returns, and was thus aware of and responsible for his large understatements during 1959 through 1965, all of which circumstances show a fraudulent intent to evade tax. Foster v. Commissioner, supra at 732; Drieborg v. Commissioner, supra at 219; Beck v. Commissioner, supra at 366; Sunbrock v. Commissioner, supra at 65. Petitioner's failure to keep adequate books and records in his business and his extensive dealings in cash are also indicative of his fraudulent intent. Although these factors are not by themselves sufficient proof of fraud, they do constitute evidence of fraud in conjunction with the other factors present in this case. Under such circumstances, courts have consistently held that failure to keep complete and accurate records of income and expenses and cash dealings are indicia of fraud. Spies v. United States, 317 U.S. 492, 499-500 (1943); Lollis v. Commissioner, 595 F. 2d 1189 (9th Cir. 1979); *116 Estate of Mazzoni v. Commissioner, 451 F. 2d 197 (3rd Cir. 1971); Gariepy v. United States, 189 F. 2d 459, 463 (6th Cir. 1951); Grosshandler v. Commissioner, 75 T.C. 1 (1980); Otsuki v. Commissioner, 53 T.C. 96 (1969). Finally, in addition to respondent's affirmative proof of petitioner's fraudulent intent, we have not found petitioner to be a credible witness. We cannot conclude that petitioner is now telling the truth when he states that he made cash advances merely because it is now in his financial interest to have done so. Of course, as indicated earlier, we do not accept petitioner's explanations about the cash advances or rebates to home improvement customers or cash payments to fire repair customers. Petitioner testified at the trial that he signed two false statements on each FHA Loan Application that he processed over this period from 1959 through 1965 knowing that such statements were false and in violation of Federal statutes, that he lied to the FBI on three different occasions when he was investigated in regard to alleged illegal kickbacks or rebates of portions of these FHA loans, that when *117 the Internal Revenue Service attempted to interview his customers in 1967 in regard to these illegal cash rebates or kickbacks that he contacted all of his customers and had them lie to the revenue agent, and that he lied about the destruction of his records, allegedly at the request of his then attorney who is now deceased. He further testified that his long-time accountant, Mr. Parker, who was never paid more than $ 500 to $ 700 per year for the few services he rendered to petitioner, allegedly knew about these illegal cash advances or rebates and undertook to hide them on petitioner's tax returns by understating gross receipts and overstating subcontractor expenses. He then testified that none of this was done to evade his Federal income taxes but merely to hide his FHA fraud. The question seems to be whether petitioner was lying then or lying now. The Court finds it difficult to believe that an individual who was so willing to tell so many lies to so many people over such a long period of time is now telling the truth. Certainly the threat of criminal prosecutions for FHA violations would be a motive for lying, but at the present time the threat of large tax deficiencies *118 and large additions to the tax for fraud would provide an equally strong motive for lying now. The Court, having the opportunity to observe the demeanor of the witness and to compare his sworn testimony with his prior actions, found petitioner wholly unworthy of belief. More importantly, however, petitioner's explanations simply fail to explain. As to the alleged cash payments to the fire repair customers, any such payments would be wholly unrelated to any FHA fraud.Such payments, if made, would not have been illegal, and there is no reason why petitioner could not have kept records of any such payments and claimed the deductions on his 1964 and 1965 returns. Petitioner, however, did not maintain any records and did not report his receipts or expenses from the fire repair business. As for petitioner's explanation that although his gross receipts were understated and his subcontractor expenses overstated, allegedly done by Mr. Parker to help him conceal the illegal cash advances or rebates to home improvement customers, that nonetheless his final tax liability as reported on his returns was correct, that simply is not the fact. As our findings show, there were substantial *119 understatements of taxable income for six of the seven years even if we were to accept petitioner's explanations about the cash advances. More importantly, the record shows that Mr. Parker prepared those returns based upon summaries and estimates that petitioner himself furnished to him. The Court did not believe petitioner's testimony about Mr. Parker, who is now deceased, and relied instead upon the sworn testimony that Mr. Parker gave during the criminal investigation. Also there was a substantial understatement of taxable income for 1965, and Mr. Parker did not prepare that return. Petitioner has never suggested that the return preparers for 1965 were trying to help him conceal illegal cash advances or rebates, and those return preparers again had to rely in part upon the bank deposits method and in part upon estimates furnished by petitioner. Finally, the whole house of cards erected by petitioner to explain the understatements of taxable income over a long period of time, namely his alleged fear of prosecution for FHA fraud, is based upon his statements that he was merely trying to run out the seven-year statute of limitations on those FHA violations but that he was not *120 trying to mislead respondent's representatives or in any way to avoid paying his correct amount of tax. However, it is interesting to note that the pertinent statute of limitations on violations of Title 18, U.S.C., section 1010 is not seven years but only five years. 18 U.S.C. § 3282; see Dichner v. United States, 348 F. 2d 167 (5th Cir. 1965). Petitioner testified that he processed his last FHA loan application in the middle of 1964 or perhaps as late as the beginning of 1965, but we assume he really meant the middle of 1965 and perhaps as late as the beginning of 1966 because the record clearly establishes that many FHA loans were being processed throughout the year 1965. In any event the FHA insured home improvement business (at least any such business purportedly involving illegal cash payments or rebates) ended in 1965 or at the latest in early 1966. The five-year statute of limitations on the FHA fraud would have expired long before petitioner's nolocontendere plea in the criminal tax case and long before August 25, 1972, the first occasion on which petitioner brought forth his story about the illegal *121 cash payments or rebates as the explanation for his understatements of taxable income on his tax returns. In summary, we conclude on this record that petitioner's consistent pattern of substantial understatments of taxable income for seven consecutive years, his acts of concealment and misleading statements to respondent's agents, his failure to maintain accurate and complete records of his business, his practice of supplying all figures used by his accountants in preparing his returns, his extensive dealings in cash, and his willingness to make false statements under oath whenever it appeared financially advantageous to do so, were part and parcel of a conscious and deliberate attempt to evade payment of his tax liabilities for each of the years 1959 through 1965. Accordingly, we hold that respondent has met his burden of proving fraud by clear and convincing evidence. The third issue for decision is whether assessment and collection of the deficiencies for the years 1959 through 1965 are barred by the statute of limitations in section 6501(a). Having determined that a part of the underpayment of tax for each of the years 1959 through 1965 was due to fraud with intent to evade *122 tax, it follows that the assessment of the deficiencies for all of those years is not barred by the statute of limitations. Section 6501(c)(1). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years here involved.↩
2. Respondent conceded that petitioner is entitled to compute taxes due for each of the years in question using the "head of household" rates. Petitioner conceded that all of his itemized deductions listed in the statutory notice for the years in issue are not allowable and that all business expense deductions listed in the statutory notice, which are not included in cost of goods sold (specifically items 3 - 16 on Exhibit B to statutory notice), are not allowable.↩
2a. In view of the credibility issues discussed in the Opinion portion below, the Court does not find this to be the fact.↩
3. Petitioner also kept two bank safety deposit boxes between 1959 and 1965, one in Detroit and one in New York. The record does not indicate whether he placed any of the proceeds from the home improvement jobs in those safety deposit boxes.↩
4. § 1010. FEDERAL HOUSING ADMINISTRATION TRANSACTIONS Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Federal Housing Administration for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Administration, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Administration, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined not more than $ 5,000 or imprisoned not more than two years, or both.↩
5. At the trial of this case, petitioner testified that Parker had never suggested to him that his records were inadequate. The Court did not believe petitioner's testimony. Parker had died before the trial of this case but his sworn testimony given during the criminal investigation was introduced into evidence.↩
6. The Court did not find petitioner to be a credible witness and Parker had died before the trial of this case.↩
7. Although Goldman testified at the trial that petitioner turned over all of his records to him, the Court is satisfied that Goldman's conclusory testimony is wholly without factual basis. In view of the many hands through which these records had passed, Goldman could not know whether or not what he received from petitioner constituted all of petitioner's records. After the trial of this case, the parties stipulated as to the documents Goldman received, and the Court has based its findings on that stipulation. However, since petitioner at one point in his testimony suggested that he had not seen these records since 1965 and at another point testified that he still had all of his records, the Court is not satisfied that petitioner ever furnished all of his records to Goldman, respondent, the Court, or to his present counsel. Petitioner's explanation at the trial of his earlier statement that he had not seen the records since 1965 was that one of his attorneys, Fred Walker, had instructed him to lie to respondent's agents and to deny having any records. Petitioner testified that this occurred on June 2, 1966, when petitioner walked in on a conversation between Walker and Special Agent Richard Daguanno and overheard Walker telling Daguanno (1) that petitioner had no records, and (2) that some of his records had been destroyed in a small fire at his Livernois office. The Court did not find petitioner to be a credible witness, and attorney Walker had died before the trial of this case.↩
8. Petitioner also testified that he did not pad the repair bills to cover such unreimburseable advances. Since the Court found petitioner's testimony to be generally unworthy of belief, the Court concludes that if petitioner engaged in any such unreimbursed private charity, it was a negligible amount.↩
9. Parker was also paid small amounts for some of the other work he did for petitioner such as the financial statements for the bank and for preparing tax returns for some of petitioner's customers, but Parker was never paid more than $ 500 to $ 700 a year by petitioner.↩
10. Although he admitted that he did not examine his returns before mailing them, petitioner testified at the trial that he knew he paid the correct amount of income taxes for each of the years 1959 through 1965, and that he had relied on Parker to hide the illegal payments and to come up with a correct final tax figure. The Court did not believe petitioner's testimony.↩
11. Daguanno never saw the records Parker had shown to Francisco. Petitioner's attorney, Fred Walker, told Daguanno that those records had been destroyed in a fire at petitioner's Livernois office. See footnote 7.↩
13. Petitioner's savings accounts were joint accounts with his mother Minnie.↩
14. These amounts represent the checks that Daguanno determined to be unreported gross receipts of petitioner from Francis Construction Company that petitioner used to pay for building supplies from United Products. ↩
15. Petitioner financed these sales personally on behalf of customers who could not get commercial loans. Petitioner financed these sales through Francis Construction Company and failed to deposit the proceeds in his business checking accounts.↩
12. Cinnamon obtained information with respect to 1965 from petitioner's C.P.A., Norman Stricof. ↩
16. These figures represent the portion of the total understatements determined to be attributable to net unreported business income as set forth in paragraph C of the explanation of items in the statutory notice. ↩
17. Error in statutory notice is due to an error on the 1962 tax return in addition of "other business expenses" on Schedule C of the return.↩
*. Respondent later conceded these items when additional substantiation was produced after the statutory notice herein was issued, and these concessions are set forth in the stipulations of facts.↩
*. Those figures have been adjusted to reflect the parties' stipulations of fact referred to above.↩
18. Petitioner argued on brief that three of these five individuals were not claimed on his summaries as customers receiving the illegal cash payments or rebates. The Court places little confidence in petitioner's belatedly prepared summaries, but in any event the Aouate survey still shows one customer in each year surveyed disclaiming receipt of the purported illegal cash payment or rebate.↩
19. See also Feinberg v. Commissioner↩, a Memorandum Opinion of this Court dated September 20, 1950.